IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

PRISCILLA SANCHEZ,
as Next Friend of ROXANNE ESTRADA

   Plaintiff,

v.          No. 2:16-cv-00749 RJ/GBW

OTERO COUNTY BOARD OF COUNTY COMMISIONERS,
CAROLYN BARELA, DANIEL STUMP, ANDREA HILES,
NENA SESLER, CORRECTIONAL HEALTHCARE COMPANIES,
INC., and DAVID BIRNBAUM,

   Defendants.

## SECOND AMENDED COMPLAINT FOR THE RECOVERY OF DAMAGES CAUSED BY THE DEPRIVATION OF CIVIL RIGHTS

   Plaintiff brings this complaint for damages caused by the violation of her civil and constitutional rights. Plaintiff files this complaint under the Federal Civil Rights Act, and the Constitution of the United States. Plaintiff also brings claims under the New Mexico Tort Claims Act. In support of this Complaint, Plaintiff alleges the following:

## JURISDICTION AND VENUE

1. Jurisdiction over the subject matter of this action is conferred by 28 U.S.C. § 1331 and 42 U.S.C. §§ 1983 and 1988. Venue is proper as the acts complained of occurred exclusively within Otero County, New Mexico.

## PARTIES

2. Roxanne Estrada (hereinafter referred to as "Roxanne"), is an individual and current resident of Otero County, New Mexico.

3. Plaintiff Priscilla Sanchez is an individual and resident of Otero County, New Mexico. Priscilla is the aunt of, and Next Friend, to Roxanne Estrada.

4. Defendant Carolyn Barela was the interim administrator of the Otero County Detention Center, (hereinafter "OCDC") at all material times until June 1, 2014.

5. Defendant Barela is sued in her individual and official capacities.

6. Defendant Daniel Stump was the warden of OCDC at all material times after June 1, 2014.

7. Defendant Stump is sued in his individual and official capacities.

8. Defendant Otero County Board of County Commissioners is a governmental entity within the State of New Mexico and a "person" under 43 U.S.C. § 1983. At all times material to this Complaint the Board was the employer of Defendants Carolyn Barela, Daniel Stump, Andrea Hiles, and Nena Sesler.

9. Defendant Andrea Hiles was a detention officer at the Otero County Detention Center at all material times.

10. Defendant Hiles is sued in her individual capacity only.

11. Defendant Nena Sesler was a detention officer at the Otero County Detention Center at all material times.

12. Defendant Sesler is sued in her individual capacity only.

13. Defendant Doctor David Birnbaum at all material times was the senior medical provider at the Otero County Detention Center.

14. Defendant Birnbaum is sued in his individual capacity only.

15. Defendant Correctional Healthcare Companies, Inc. (hereinafter referred to as "Defendant CHC"), is a Delaware corporation doing business in New Mexico. Defendant CHC was at all material times the employer of Defendant David Birnbaum.

16. Defendant CHC was contractually responsible for the provision of health care at OCDC during the events material to this complaint.

17. Defendants were acting under color of state law and within the scope of their employment at all material times.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

18. Roxanne Estrada was 22 years old when she was booked into the Otero County Detention Center (hereinafter "OCDC") on December 4, 2013.

19. Prior to her detention, Roxanne had a long history of mental health issues, including treatment for depression and schizophrenia.

20. Immediately upon entering the jail, OCDC staff were aware that Roxanne had a history of mental health problems.

21. The following day, Roxanne was seen by medical after she expressed concerns of being pregnant.

22. Roxanne was menstruating at the time, but a pregnancy test was still conducted, which was negative.

23. Roxanne continued to have delusions of pregnancy throughout her detention.

24. Despite her delusions, Roxanne was not provided mental health counseling.

25. Roxanne remained in a holding cell for two months after being booked into the jail without any additional medical care.

26. Records also indicate Roxanne did not receive any mental health care during these two months.

27. Throughout this time Roxanne continued to exhibit obvious symptoms of mental health issues.

28. On February 4, 2014 Defendant Sesler made a note in Roxanne's file that she was exhibiting "bizarre behavior."

29. The following day Roxanne told Defendant Hiles that she wanted to kill herself and was heard crying hysterically in her cell.

30. In response, Defendant Hiles wrote an incident report and noted Roxanne had been "exhibiting strange behavior."

31. Another incident report was written by Defendant Hiles on the same day in response to other inmates seeing Roxanne talking to people who were not there and sticking coke bottles in her vagina.

32. Roxanne was seen on February 7, 2014 by Defendant Dr. David Birnbaum.

33. Dr. Birnbaum noted that Roxanne had been refusing to cover herself and was seen in the holding cell naked.

34. After assessing Roxanne, Defendant Birnbaum noted an impression of schizophrenia.

35. Despite her bizarre behavior and schizophrenic symptoms, Defendant Birnbaum failed to prescribe Roxanne any medications and failed to follow up with psychiatric care.

36. In response to her behavior, Roxanne was moved into Detox B and placed on suicide watch by Defendant Hiles.

37. Detox B is a small, concrete solitary confinement cell with no bed, sink, or toilet except a metal grate covering an open drain.

38. Roxanne was kept in this cell 24 hours per day and was forced to defecate and urinate in the open drain in the center of her cell.

39. This cell also has a large window facing the open booking area, allowing any person in the booking room to see into the cell.

40. With the large window in her cell, Roxanne would often try to defecate in the corner of her cell so she could have the illusion of privacy.

41. After being moved to the detox cell, Roxanne continued to exhibit the same bizarre behavior she had been exhibiting for the prior two months.

42. Roxanne constantly removed her suicide smock and remained fully or partially naked in her cell at almost all times.

43. On February 9, 2014 Roxanne was seen shoving a spork into her ear.

44. OCDC Officer Chad Cantrell entered Roxanne's cell to remove the spork she was putting in her ear.

45. After confiscating it, Roxanne started yelling for help and that her baby could not breathe and needed the spork back so she could help her baby.

46. Guards recorded that throughout the day Roxanne was "acting really strange," "hearing things," "walking around half naked," "pulling her hair," and "bangs head sometimes."

47. Guards also reported Roxanne was "really freaking out."

48. Despite her behavior, Defendant Hiles continued to approve Roxanne's prolonged isolation.

49. Later that day, Roxanne was removed from her cell to use the restroom.

50. When Roxanne was escorted back to her cell she told guards she did not want to go back in the detox cell because "she gets bad dreams in the cell."

51. Despite Roxanne's obvious mental health crisis, records indicate Roxanne received no mental health intervention, nor was any requested.

52. The next day, On February 10, 2014, Roxanne was seen naked in her cell sticking her sandwich in her vagina.

53. Roxanne often refused to eat her meals and would instead put her food into her ears or vagina.

54. Over the next several weeks Roxanne remained on suicide watch exhibiting the same bizarre behavior as the previous months.

55. On February 12, 2014 Roxanne was seen again "trying to put food in body cavities."

56. On February 13, 2014 Roxanne was knocking on her cell door asking to get out "because of her baby."

57. On February 14, 2014 Roxanne's food tray was removed because she was putting graham crackers in her ears.

58. Roxanne continued to be fully or partially naked in her cell daily.

59. Because of the large window in her cell, OCDC staff and other inmates, male and female, were able to see Roxanne naked in her cell.

60. Inmates and guards were also able to see Roxanne putting food into her vagina through her window.

61. On February 24, 2014 Roxanne used the restroom on her clothing in her cell.

62. Roxanne continued to experience delusions and obvious symptoms of a serious mental health crisis, yet was allowed to remain isolated without any mental health care.

63. Finally, on March 3, 2014, four months after being booked into the jail, Roxanne was finally seen by a mental health provider.

64. During this interview, the provider noted Roxanne appeared disheveled and was making odd gestures and talking to herself.

65. After Roxanne's assessment, the provider recommended that OCDC staff house her in general population and monitor her closely.

66. Despite this recommendation, Roxanne remained in isolation, housed in Detox B, the cell with an open drain for a toilet.

67. Roxanne was taken off suicide watch on March 12, 2014 but was not removed from Detox B.

68. Since her entry to OCDC more than four months prior, records indicate Roxanne had only been allowed out of her cell for recreation or exercise on one occasion.

69. In addition, often the only time Roxanne was allowed out of her cell was when she was moved into a holding cell to use the restroom or for short, infrequent showers.

70. On March 19, 2014 Roxanne was again placed on suicide watch, this time approved by Defendant Sesler.

71. Roxanne remained housed in Detox B when placed back on suicide watch.

72. The following day OCDC medical staff assessed Roxanne and made a note that she likely was suffering from dissociative schizophrenia and referred her to Defendant Birnbaum.

73. On March 22, 2014, a Saturday, Roxanne was prescribed Clonazepam.

74. Roxanne began receiving Clonazepam on March 26, 2014.

75. Despite her diagnosis, Roxanne remained in isolation without treatment from a mental health professional.

76. As a result of her mental illness, Roxanne often refused her medication.

77. When Roxanne was administered medications, medically untrained detention officers dispensed them.

78. Without medical training, these guards were unqualified to respond appropriately to Roxanne's refusals of medication.

79. On March 29, 2014 Roxanne was placed on administrative segregation by Defendant Hiles "to make room for suicidal subjects" and moved to cell "Juvenile B."

80. Roxanne was on suicide watch when this change was made.

81. Roxanne remained on suicide watch in cell "Juvenile B" for several more days, then was moved back into a holding cell.

82. On April 21, 2014 Roxanne was seen by the "Crisis Intervention" staff with La Frontera.

83. Roxanne told La Frontera staff that people were trying to hurt her.

84. Roxanne was also having audio and visual hallucinations.

85. As a result, a psychological evaluation was recommended.

86. Upon information and belief, no psychiatric evaluation was scheduled for Roxanne following this recommendation.

87. The following day, Roxanne was seen standing over a toilet masturbating with her deodorant and trying to harm herself.

88. Roxanne was taken to medical following these incidents and medical staff noted Roxanne was decompensating.

89. Staff also reported Roxanne continued to take off her clothes and was "responding to internal stimuli."

90. Roxanne was placed back onto suicide watch and photos were taken of her neck where she attempted to self-harm.

91. While Roxanne was on suicide watch she continued to exhibit the same bizarre behaviors as before: remaining naked in her cell, refusing to eat, sticking food in her vagina, and talking to herself.

92. Still, Roxanne remained isolated, without regular showers or being allowed out of her cell for recreation.

93. On May 3, 2014 Roxanne was allowed out of her cell for recreation for the first time in nearly 3 months.

94. Over the next several months Roxanne's mental health continued to deteriorate.

95. On May 18, 2014 Roxanne wet herself in her cell.

96. On May 24, 2014 Roxanne was seen peeing into a cup in her cell.

97. On May 26, 2014 Roxanne was moved to a holding cell.

98. Holding cells at OCDC are small, concrete rooms in the booking area constructed for temporary holding during the intake process rather than for permanent housing.

99. Roxanne was housed in a holding cell for an entire month.

100.    Roxanne quickly lost her ability to care for herself and control her bodily functions.

101.    Roxanne continued urinating, defecating, and vomiting in her cell.

102.    Despite her obvious mental health symptoms, Roxanne remained in isolation talking to herself, laughing to herself, and pacing around naked, without mental health care.

103.    On June 26, 2014 Roxanne was taken off of suicide watch and filled out a request for medical services.

104.    Under "mental health," Roxanne wrote "I sought a flue [sic]," under "other" wrote "I'm yearning!!!" and wrote in the margins "Ok I'm getting mad I'm supposed to be out of here to see me [sic] doctor."

105.    Records indicate Roxanne's request was not replied to and no medical services were provided.

106.    Four days later, Roxanne was placed back onto suicide watch; the fourth time since she was booked into the jail.

107.    On July 1, 2014 Roxanne was seen walking around her cell with a menstrual pad on her forehead talking about rainbows.

108.    On July 3, 2014 Roxanne was seen "nude from the waist down, rambling speech," and throwing toilet paper everywhere.

109.    Later that day other inmates complained to OCDC staff that Roxanne was putting stuff into her vagina.

110.    In response, guards removed everything from Roxanne's cell, except her bedding.

111.    On July 6, 2014 Roxanne was seen wiping food on her "body and unknown places."

112.    The following day, Roxanne was seen wiping mashed potatoes and gravy in her hair.

113.    Roxanne was also seen trying to shove her sheets down the open drain in the middle of her cell.

114.    In response the only remaining items in Roxanne's cell, her sheets, were confiscated.

115.    Roxanne remained on suicide watch until August 1, 2014 when Defendant Hiles placed her on administrative segregation for "mental issues."

116.    After being moved to the segregation pod, Roxanne continued to deteriorate.

117.    During this time, Roxanne was housed naked, with a mattress on the floor in a common area, rather than a cell.

118.    Inmates frequently saw Roxanne naked on the floor, disheveled, covered only by a suicide blanket.

119.    Inmates complained to OCDC and CHC staff regarding Roxanne's treatment.

120.    One inmate, upon seeing Roxanne naked on the floor in a common area, asked medical officer Arredondo, "Why do you have Roxanne like that? Why do you have her on display?"

121.    Medical Officer Arredondo responded, "That's what drugs will do for you. She has her turtle suit; that's how she chooses to be."

122.    The inmate broke into tears upon seeing how horrible Roxanne's condition was, as she knew her as a little girl.

123.     OCDC and CHC ignored and disregarded these complaints and made no changes in Roxanne's treatment or housing at OCDC.

124.     On August 9, 2014, staff believed Roxanne had pretended to take her medication, but hidden it in her pants.

125.     Roxanne was searched by medical staff and no pill was found.

126.     Regardless, staff placed her medications on hold until she was seen by Defendant Birnbaum.

127.     Four days later, on a day he was not in the facility, Defendant Birnbaum discontinued Roxanne's prescription for Clonazepam.

128.     As a result, Roxanne did not receive any medication for her severe mental illness for the next four months.

129.     On October 22, 2014 medical staff were informed Roxanne had continued refusing oral intake of meals and attempted to only put food in her vagina and ears.

130.     At this point, Roxanne had been intermittently refusing oral intake of food for over ten months without medical intervention.

131.     Following this report, Roxanne's weight was taken; she had lost 50 pounds while in the jail.

132.     The following day, labs were taken and reviewed by Defendant Birnbaum.

133.     Based on the lab results, Roxanne was diagnosed with "failure to thrive."

134.     Failure to thrive is almost exclusively diagnosed in young children and elderly adults, and is often a result of an abusive or neglectful environment.

135.     Roxanne continued to be housed in isolation following this diagnosis.

136.    On November 7, 2014, more than 11 months after entering the jail, Roxanne's condition became so emergent that medical staff ordered Roxanne be transferred to the hospital.

137.    The following day Roxanne was admitted to Gerald Champion Regional Medical Center.

138.    Roxanne remained hospitalized until December 10, 2014 when she was transferred to the New Mexico Behavioral Health Institute (NMBHI).

139.    Upon arrival at NMBHI, Roxanne was assessed by medical and mental health staff.

140.    During her assessment, Roxanne's diagnoses were listed as schizophrenia, borderline intellectual functioning, depression, anxiety, and insomnia, with nightmares.

141.    Roxanne appeared disheveled and reported she was "acting like a barn animal" at the jail and had not combed her hair.

142.    Upon information and belief she had developed head lice while at the jail.

143.    During her initial psychological evaluation, staff noted Roxanne was lethargic, had slow psychomotor activity, restricted affect, and appeared depressed.

144.    Roxanne remained at NMBHI until January 20, 2015 and was returned to OCDC.

145.    Incredibly, Roxanne was housed back in a solitary cell after her return from NMBHI.

146.    Roxanne remained at OCDC for a short time and was released from custody on February 9, 2015.

## COUNT I: VIOLATION OF PROCEDURAL DUE PROCESS
## (DEFENDANTS BARELA AND STUMP)

147.     Plaintiff restates each of the preceding allegations as if fully stated herein.

148.     Roxanne was placed into extraordinary periods of solitary confinement.

149.     Roxanne was not afforded a hearing before being placed in solitary confinement.

150.     While in solitary confinement, Roxanne did not have access to the basic programming and services received by other inmates in the facility.

151.     While in solitary confinement, Roxanne's access to telephone calls, mail, visitation, recreation, group therapy sessions and commissary were restricted as compared to the general population.

152.     While in solitary confinement, Roxanne's mental health deteriorated to the point she could no longer advocate for herself.

153.     The conditions of confinement Roxanne was subjected to were so degrading, dehumanizing, and torturous they amounted to de facto punishment of a pretrial detainee.

154.     Roxanne received no due process for this punishment.

155.     Defendants Barela and Stump knew her conditions were punishing and provided no due process, notwithstanding those conditions.

156.     In placing Roxanne in solitary confinement for such long periods of time without affording her a hearing, or periodic classification review, Defendants Barela and Stump denied Roxanne procedural due process of law as guaranteed by the Fourteenth Amendment.

## COUNT II:  VIOLATION OF SUBSTATNIVE DUE PROCESS: INHUMANE CONDITIONS OF CONFINEMENT/ INADEQUATE MEDICAL CARE (All Defendants)

157.    Plaintiff restates each of the preceding allegations as if fully stated herein.

158.    Roxanne has a substantive due process right under the Fourteenth Amendment to humane conditions of confinement and adequate medical care.

159.    Rather than treat Roxanne's mental health condition, Defendants Barela, Stump, Sesler, and Hiles chose to place her in solitary confinement.

160.    Defendants Barela, Stump, Sesler, and Hiles allowed Roxanne to spend long periods of time naked in her isolation cell.

161.    Defendants Barela and Stump, as the wardens of OCDC, had a duty to know who was being housed in segregation at the jail.

162.    Defendants Barela and Stump had a duty to ensure inmates housed in solitary confinement were housed in humane conditions.

163.    Defendants Barela and Stump knew Roxanne's mental condition had deteriorated incredibly since being booked into segregation at OCDC.

164.    Roxanne's mental health deteriorated to the point she began putting food in her vagina, in her ears, and on her body; and was unable to care for herself.

165.    Roxanne was often forced to urinate, defecate, and vomit in her cell.

166.    As a result, Roxanne lived in unsanitary, squalid conditions for the entirety of her detention at OCDC.

167.    For the majority of her detention, Roxanne remained naked in her cell.

168.    During a large portion of her detention Roxanne was housed in the booking area of the jail, located in the entrance.

169.    The booking area is a co-ed housing area, made for temporary holding during the intake process.

170.    The cells in this area are not designed for permanent housing, yet Roxanne remained in these cells for the majority of her detention.

171.    Roxanne spent a large portion of her detention in cell Detox B, which had a large window open to the booking area of the jail.

172.    Because of this, anyone entering the jail, including male guards and inmates, were able to see into her cell.

173.    Allowing Roxanne to be seen by male and female guards, inmates, and others entering the jail while naked, defecating, vomiting, and shoving food into her vagina is dehumanizing and degrading.

174.    Roxanne's situation became notorious within the jail as she was constantly naked in a public areas.

175.    All Defendants knew of her inhumane treatment.

176.    Fellow inmates complained to Defendants of the inhumane treatment of Roxanne.

177.    Roxanne's cousin also became aware of her condition and contacted the jail.

178.    When she called, the staff member she spoke with knew exactly who she was calling about.

179.    The staff member told Roxanne's cousin that Roxanne "was having real difficulties in the jail."

180.    Despite this knowledge, Roxanne's conditions did not improve.

181.    As Roxanne's condition worsened, her behavior made it obvious she was in need of immediate medical attention.

182.    Defendants Barela, Stump, Sesler, and Hiles knew Roxanne was not competent to make her own medical decisions.

183.    Defendants Barela, Stump, Sesler, and Hiles knew that Roxanne frequently refused to eat and as a result had lost an extraordinary amount of weight.

184.    As the senior medical provider at OCDC, Defendant Birnbaum had a duty to ensure all inmates, including Roxanne, received adequate medical care.

185.    Upon information and belief, Defendant Birnbaum worked a total of four (4) hours per week, on Fridays, at OCDC.

186.    Upon information and belief, it was during these hours Defendant Birnbaum would see patients and write reports.

187.    Defendant Birnbaum saw Roxanne's condition in solitary confinement during his time in the jail.

188.    Defendant Birnbaum knew that Roxanne was not receiving adequate care during her detention.

189.    Eventually, several months into her detention, Defendant Birnbaum prescribed Roxanne a strong mental health medication, Clonazepam.

190.    Defendant Birnbaum failed to follow-up on Roxanne's condition and reaction to the medication.

191.    In August, Defendant Birnbaum abruptly stopped Roxanne's medication regiment, subjecting her to dangerous symptoms of withdrawal.

192.     Despite Roxanne's obvious decompensation, Defendant Birnbaum failed to intervene and ensure Roxanne received proper care.

193.     Defendants Barela, Stump, Birnbaum, Sesler, and Hiles failed to take reasonable measures to prevent the harm caused by Roxanne's self-destructive actions, which were worsened by the isolation of solitary confinement coupled with inadequate medical care.

194.     Defendants Barela, Stump, Birnbaum, Sesler, and Hiles knew Roxanne faced a substantial risk of serious mental or physical harm if her conditions of confinement did not meet contemporary standards of decency.

195.     Defendants Birnbaum, Hiles, and Sesler had a duty to intervene and prevent this inhumane treatment rather than actively participate in it.

196.     Defendants Birnbaum, Hiles, and Sesler were aware of the inhumane conditions in which Roxanne was being housed.

197.     Defendants Birnbaum, Hiles, and Sesler saw Roxanne naked and disheveled throughout her stay at OCDC.

198.     Defendant Birnbaum knew that Roxanne was in desperate need of mental health care but failed to intervene to ensure it was provided.

199.     Defendants Hiles and Sesler not only watched Roxanne be treated inhumanely, but approved her continued inhumane treatment and housing conditions.

200.     All Defendants acted with deliberate indifference to this risk.

201.     Roxanne quickly deteriorated and was eventually diagnosed with failure to thrive.

202.    Failure to thrive is almost exclusively diagnosed in young children and the elderly.

203.    Although she was only 23 years old, Roxanne's environment and neglect in isolation resulted in her failure to thrive and subsequent diagnosis.

204.    Roxanne's conditions of confinement, as described above, amounted to punishment of a pre-trial detainee in violation of the Fourteenth Amendment to the United States Constitution.

205.    As a proximate and foreseeable result of Defendants' deliberate indifference Roxanne suffered injuries including pain and suffering, emotional distress, and exacerbation of her mental illness.

## COUNT III:  VIOLATION OF THE AMERICANS WITH DISABILITIES ACT (DEFENDANTS BOARD OF COUNTY COMMISSIONERS, BARELA, AND STUMP (in their official capacity))

206.    Plaintiff restates each of the preceding allegations as if fully stated herein.

207.    Roxanne is entitled to be free from discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq.

208.    Defendants failed to accommodate Roxanne's mental disability and denied her the benefits and services of the jail by reason of her mental disability.

209.    Roxanne was denied social interaction by reason of her mental disability.

210.    Roxanne was unnecessarily segregated due to her mental disability.

211.    Roxanne was denied reasonable standards of hygiene and medical care due to her mental disability.

212.    Roxanne was denied the usual services and programming offered to other inmates due to her mental disability.

19

213.     Upon information and belief, Defendants house many mentally ill prisoners in solitary confinement.

214.     Upon information and belief Defendants Barela and Stump had a policy and practice of housing the seriously mentally ill in isolation.

215.     Rather than provide the necessary mental health care and medications to mentally ill inmates, Defendants Barela and Stump have repeatedly elected to use solitary confinement to control their behavior.

216.     As a proximate and foreseeable result of Defendants Barela and Stump's discriminatory acts and omissions Roxanne suffered injuries including pain and suffering, emotional distress, and exacerbation of her mental illness.

## COUNT IV: CUSTOM AND POLICY OF VIOLATING CONSTITUTIONAL RIGHTS (Official Capacity Defendants)

217.     Plaintiff states each of the preceding allegations as if fully stated herein.

218.     Defendant Board of County Commissioners has delegated the responsibilities of running OCDC to Defendants Barela and Stump.

219.     Defendants Barela and Stump are the therefore the final policy makers responsible for the hiring training and supervision of OCDC employees.

220.     Defendants Barela and Stump's policies therefore became the customs and policies of the County.

221.     Upon information and belief, Defendant Barela and Defendant Stump have created a custom and policy of housing the mentally ill in segregation or solitary confinement.

222.     Upon information and belief, numerous inmates' mental health have deteriorated while in isolation in OCDC.

223.     Prior to Roxanne's detention at OCDC, former warden Virginia Blansett had housed another inmate, Jerome Gonzales, in the same cell until he became mentally incompetent.

224.     Former jail officials Virginia Blansett and Shirley Walker, and Defendant Board were served with a complaint in May 2014, filed on behalf of Jerome Gonzales outlining his inhumane conditions of confinement at OCDC.

225.     This complaint was filed while Roxanne was housed in Detox B, the same cell Jerome Gonzales had been isolated in.

226.     Defendant Barela was the interim administrator at the time of Jerome's complaint; Defendant Stump replaced her only a few weeks later.

227.     Following this, Roxanne remained housed in these conditions for an additional six months until her condition became so bad she had to be transferred out of the facility and admitted into a hospital.

228.     Defendants Barela, Stump, and Birnbaum were aware of Jerome Gonzales's case and the conditions he was subjected to.

229.     Defendants Barela and Stump knew the conditions Roxanne was subjected to at OCDC would result in similar deterioration experienced by Jerome Gonzales.

230.     A community doctor had written letters to the jail pointing out its deliberate indifference to the mental health needs of the inmates in the facility.

231.     Despite their knowledge, Defendants failed to ensure Roxanne received adequate mental health care.

232.    Defendants Barela and Stump continued the practices and polices set in place by Virginia Blansett and Shirley Walker, as described in the Jerome Gonzales lawsuit.

233.    Upon information and belief, the policies, customs, decisions, and practices of Defendant Barela and Stump have created a climate within OCDC whereby the mentally ill are deprived of adequate medical care and humane conditions of confinement.

234.    There is a causal connection between Defendants' policies and the violation of Roxanne's constitutional rights, which amounts to deliberate indifference.

### COUNT V: NEGLIGENT PROVISION OF MEDICAL CARE
### (Defendants Correctional Healthcare Companies and David Birnbaum)

235.    Plaintiff states each of the preceding allegations as if fully stated herein.

236.    Defendant Correctional Healthcare Companies (CHC) was contracted by Otero County to provide medical and mental health care to inmates housed at OCDC at all material times.

237.    Defendant David Birnbaum was employed by Defendant Correctional Healthcare Companies (CHC) as the director of medical services at OCDC.

238.    Defendants CHC and Birnbaum entered into a contract for clinical services at OCDC that was grossly inadequate to meet the healthcare needs of those housed in the jail.

239.    The contract required Birnbaum only provide four (4) hours of work per week.

240.    This time included supervision of nursing staff, maintaining accurate and complete records and files, and provision of clinical care.

241.    This contract also required medical services be provided only by Defendant Birnbaum, and not be delegated to any other person.

242.    The Otero County Detention Center is a 208 bed facility.

243.    It is not possible for any physician to provide adequate care and complete adequate medical records in such a short amount of time.

244.    Defendants CHC, the County and Birnbaum knew when he signed the contract he would be unable to provide adequate care and supervise nursing staff in such a short period of time.

245.    Upon information and belief, Defendant Birnbaum was only at the facility for four (4) hours on Fridays.

246.    According to medical records from OCDC, the majority of the interactions with medical staff occurred between Saturday and Thursday, when Defendant Birnbaum was not present.

247.    Defendant Birnbaum allowed and encouraged unqualified staff to provide Roxanne medical care.

248.    When Defendant Birnbaum arrived at the jail on Fridays, he went through all paperwork associated with care of inmates for the previous week and signed off on medication requests.

249.    This led unqualified staff to prescribe and discontinue medications without adequate supervision of a medical doctor.

250.    This amounts to rubber stamping of the care Roxanne and other inmates received.

251.    Defendants CHC and Birnbaum had a duty to provide all inmates at OCDC, including Roxanne, adequate medical and mental health care.

252.    During her detention, Roxanne stopped eating, lost approximately fifty (50) pounds, was disheveled, lost the ability to control her bodily functions, and developed lice.

253.    Defendant David Birnbaum saw Roxanne's condition decline during her stay at OCDC.

254.    Defendant David Birnbaum knew that Roxanne was in serious need of medical and mental health treatment during her stay at OCDC.

255.    Defendant David Birnbaum had a duty to treat Roxanne's medical conditions, including her weight loss, loss of control over her bodily functions, and head lice.

256.    Defendant Birnbaum knew that Roxanne had been shoving food and items into her vagina throughout her detention.

257.    Despite this, Defendant Birnbaum never ensured Roxanne received any gynecological exams to ensure nothing remained in her vagina, or that she had not suffered any physical damage or infection.

258.    Defendant David Birnbaum's actions were more than negligent, and reached the level of deliberate indifference.

259.    It was clear to Defendants David Birnbaum and CHC that Roxanne was in need of medical and mental health care.

260.    Defendant CHC knew that its staff was routinely not providing the necessary care to inmates at OCDC, including Roxanne.

261.     Defendants CHC and Birnbaum knew the amount of time Defendant Birnbaum was contracted for was grossly insufficient for the duties he was required to perform.

262.     Defendants CHC and Birnbaum failed to act reasonably under the circumstances and failed to provide the medical and mental health care Roxanne desperately needed.

263.     In doing so, Defendants David Birnbaum and CHC breached their duty to Roxanne.

264.     As a result of Defendants' negligence, Roxanne was diagnosed with failure to thrive.

265.     As a result of Defendants CHC and David Birnbaum's negligence, Roxanne suffered injuries including pain and suffering, emotional distress, and exacerbation of her mental illness.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all counts so triable.

WHEREFORE, Plaintiff requests judgment as follows:

1. Compensatory damages in an as yet undetermined amount, jointly and severally against all Defendants, including damages for attorney's fees and emotional harm.

2. Punitive damages in an as yet undetermined amount severally against the individually named Defendants.

3. Reasonable costs and attorney's fees incurred in bringing this action.

4. Such other and further relief as the Court deems just and proper.

Respectfully submitted,

COYTE LAW P.C.

 /s/ Matthew E. Coyte
Matthew E. Coyte
Attorney for Plaintiff
201 Third Street, NW, Suite 1920
Albuquerque, NM 87102
(505) 244-3030

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 20th of March, 2017, I filed the foregoing electronically through the CM/ECF system, which caused all counsel of record to be served by electronic means.

 /s/Matthew E. Coyte
Matthew E. Coyte